COMMONWEALTH *vs.* THOMAS R. SNOOK. No. 89-P-655. March 9, 1990. *Practice, Criminal*, Conduct of prosecutor, Access to witnesses.

The defendant Thomas R. Snook learned that his eighteen year old daughter, Kimberly, who lived with his former wife and her husband, Peter Staffieri, had quarreled with Staffieri, and that she had been brutally — as the defendant thought — ordered out of the house. That evening (September 1, 1986) the defendant in his red Dodge van came by the Staffieri apartment house at 30 Rich Street, Malden. Firing a .38 caliber re-

volver at Staffieri's parked Ford Thunderbird, the defendant blew out the car windows on the passenger side and did damage to the chrome frame and interior of the car. Police officers, proceeding to the apartment of the defendant's girlfriend at 34 Woodlawn Street, Everett, heard Kimberly, who was present, shouting over the telephone to her mother that the defendant had shot out the windows. The defendant was also present. He was placed under arrest. He told the police that he had done it and would do it again. He went with the police to his parents' house. His van was parked there. He said a revolver could be found in the cellar, and a .38 caliber revolver was retrieved there.

Such in brief outline were the facts of the case as they could appear to the jury of six. The Commonwealth's main witnesses — Peter Staffieri; Jean VanderWoude, a neighbor; Michael Fineberg, a visitor at the scene; Thomas Kinsella and Charles Marchese, the arresting police officers — provided converging details of proof, and the jury could and did find beyond a reasonable doubt that the defendant was guilty of discharging a firearm within 500 feet of a building, of malicious destruction of property over $100 in value, and of carrying a firearm without a license. (At the previous bench trial he had been convicted of the same offenses but acquitted of the additional charge of receiving stolen property over $100 in value.)[1]

Appealing from the judgments of conviction, the defendant contends that they must be reversed for an extraneous reason, namely, that the prosecutor coerced a potential witness, Kimberly Snook, to refrain from giving testimony, and that the judge mistakenly declined to dismiss the case on that account. This claim is related to the constitutional right of an accused to make a defense. See *Webb* v. *Texas*, 409 U.S. 95, 98 (1972); *Commonwealth* v. *Crawford*, 12 Mass. App. Ct. 776, 782-783 (1981).

The situation as represented by counsel and subsequently depicted in affidavits submitted to the judge was as follows.[2] During jury selection on the morning of October 20, 1987, a list of possible witnesses was read out to the venire. At afternoon recess after the seating of the jury, the prosecutor asked the victim, Staffieri, to identify names from the defense witness

---

[1]The defendant's story, which the jury disbelieved, was that he had not left his girlfriend's apartment between 4:30 and 10:30 P.M. on the day when the police came and arrested him. He said his brother had borrowed the red van around 4:00 P.M. that afternoon. The brother testified that the van overheated and stalled and he parked it outside their parents' house around 9:00 P.M. As to Kimberly's shouted remark on the telephone to her mother, the defendant said he told Kimberly to put the blame on him in order to scotch any idea that Kimberly was responsible for the shooting.

[2]The trial judge received affidavits of Kimberly Snook, the prosecutor, and Peter Staffieri. At the court's request, the Commonwealth filed a list of potential witnesses and a summary of anticipated testimony, to which the police report was attached.

list that the prosecutor did not recognize. In the conversation that followed, Staffieri said he had talked the previous evening with Kimberly Snook (her name had been on the list as a potential defense witness); she said the defendant had asked her to testify, but she did not want to do so; she would only come in if she could tell the truth and she did not want to lie.[3] The prosecutor asked Staffieri to get in touch with Kimberly and have her call his office. About 2:00 P.M. that day Kimberly called.

Kimberly described her conversation with the prosecutor in her affidavit: "He [the prosecutor] then said, I believe you are coming in as a witness for your father. Mr. Peter Staffieri told me that you were going to lie on the stand for your father. [The prosecutor] then said are you going to lie for your father. I told him, no I wasn't going to lie, I was just going to say the cops did not knock, they just walked through the door.[4] Then I told him I wasn't coming in at all because my father never called me. He then said I might need you for a witness." Kimberly added: "As a result of this conversation with [the prosecutor] I became very scared and upset."

The prosecutor's affidavit recounts the conversation thus: He said he wanted to determine whether (as Staffieri had said), "she had been asked to testify for her father . . . but that she did not want to testify because she did not want to lie." She answered "in a wavering voice" that "she had told her father . . . that she could only testify about what happened when the police arrived at the house on the night of his arrest and that she wasn't going to lie on the stand." She also said "she did not want to testify at all." The prosecutor asked her "whether or not her father . . . had asked her to lie as a witness and she stated that he had not." The prosecutor said he did not know "whether I would call her to testify . . . or whether her father's attorney might call her . . . but not to worry about that."

The fact of the conversation between Kimberly and the prosecutor was brought to the judge's attention later that afternoon and made the subject of a formal defense motion to dismiss on the following morning, October 21. The judge, provisionally denying the motion, found as follows:

---

[3]This paraphrases Staffieri's affidavit. In the prosecutor's affidavit, he says Staffieri reported that Kimberly said she "did not wish to testify because she did not want to lie."

[4]This statement refers to the officers' entering the apartment of the defendant's girlfriend immediately before arresting the defendant. The prosecutor was acquainted with this episode through the police report. The prosecutor also had reason to know that VanderWoude, one of the Commonwealth's witnesses, said she had seen a young woman who looked like Kimberly Snook standing outside 30 Rich Street when the red van drove down the street; after the shooting she saw the young woman get into a canteen truck with a young man and drive away. (Kimberly's boyfriend was known to drive a canteen truck.)

"Number one, I believe that based on the evidence before the court, there has been no prosecutorial misconduct.

"Secondly, I find that Kimberly Snook may, in fact, not be a witness for the defense and that, in fact, the defense has not even spoken directly with Kimberly Snook regarding the substance of her possible testimony. So it is unclear to this court from the record — certainly for purposes of meeting your burden on the motion — that Kimberly Snook in some way would have testified in any exculpatory manner.

"Thirdly, I will give an opportunity during the proceedings, if and when Kimberly Snook is presented to the court, to allow a voir dire of Kimberly Snook outside of the presence of the jury to determine what, if any, harm may have taken place by the conversation that [the prosecutor] had with Miss Snook. If some harm took place and if that harm can be attributed to the district attorney's office, the court will consider sanctions to impose, instructions to the jury, et cetera, at that time — it may consider those.

"But, at this time my ruling will stand, based on the findings that I've made."[5]

The Commonwealth brought Kimberly into court by subpoena at 4:30 P.M. on October 21. The judge told Kimberly that both counsel were interested in what she might testify to, and he directed her to return to court the following morning so that counsel could interview her before the jury resumed hearing witnesses. By the following morning, however, Kimberly had been hospitalized. (She had been previously hospitalized and released one month before the criminal episode.) Neither side pursued further the question of possible coercion.

We think the trial judge should have been more critical of the prosecutor's conduct, but in the end there was no error.

One can imagine a case where a prosecutor's approach to a potential witness is so threatening that a drastic sanction of dismissal should be imposed, as a warning to other prosecutors, without regard to the witness's actual reaction or to the nature of the testimony the witness might give. See *Commonwealth* v. *Manning*, 373 Mass. 438, 443-445 (1977); *United States* v. *Morrison*, 535 F.2d 223, 225-228 (3d Cir. 1976); *United States* v. *Hoffman*, 832 F.2d 1299, 1305 n.7 (1st Cir. 1987). Compare *Commonwealth* v. *St. Pierre*, 377 Mass. 650, 659-661 (1979); *Commonwealth* v. *Davis*, 13 Mass. App. Ct. 179, 184-185 (1982). We do not think the pros-

---

[5]The judge then allowed a defense motion to suspend the proceedings until 2:00 P.M. that day so that the defendant might apply to the Supreme Judicial Court to review the order denying the motion to dismiss. A single justice of the Supreme Judicial Court denied the application without a hearing. The trial resumed about 2:30 P.M.

ecutor's conversation with Kimberly, as reported by either of them, was of that egregious character. For contrast, see *Webb*, 409 U.S. at 95-96; *Commonwealth* v. *Ragonesi*, 22 Mass. App. Ct. 320, 323-324 (1986); *Morrison*, 535 F.2d at 225-226. The judge rather saw the prosecutor's intervention as unexceptionable; the prosecutor was not barred from approaching Kimberly, and the judge evidently sized up the exchange as not menacing or not materially so. See *United States* v. *Blackwell*, 694 F.2d 1325, 1334-1336 (D.C. Cir. 1982); *United States* v. *Viera*, 839 F.2d 1113, 1115 (5th Cir. 1988). Compare *Commonwealth* v. *Festa*, 369 Mass. 419, 422-423 (1976); *Commonwealth* v. *Bray*, 19 Mass. App. Ct. 751, 759-760 (1985). We think the prosecutor would have done better to avoid the question of lying and to inquire simply what Kimberly knew or had to say; but we note that such coercion as Kimberly might have felt would probably have been mitigated by the fact that within a couple of hours after the conversation she was brought within the court's protection. Although the prosecutor is not wholly absolved of fault, still the defendant could make no progress with his motion unless he produced evidence to indicate that the testimony Kimberly might give would be material to the defense and helpful to it. See *United States* v. *Valenzuela-Bernal*, 458 U.S. 858, 867 (1982); *Crawford*, 12 Mass. App. Ct. at 783-784; *Davis*, 13 Mass. App. Ct. at 184-185. On the present record no such showing was made or even seriously attempted. Indeed, as the judge pointed out, the defense had in fact made no preparations to call her as a witness. See *Hoffman*, 832 F.2d at 1301, 1304-1305. And with Kimberly's hospitalization, the trail regarding alleged coercion ends.[6]

As a second point, the defense contends that the prosecutor's closing speech departed unduly from the evidence. We find no such fault.

*Judgments affirmed.*

*Richard C. Chambers* for the defendant.

*Rosemary D. Mellor*, Assistant District Attorney, for the Commonwealth.

---

[6]As the trial was drawing to an end on Friday, October 23, the Commonwealth moved for a continuance to call Kimberly Snook (who was still in the hospital) and Susan Staffieri, her mother, as witnesses on Monday, October 26. The motion was denied and closing speeches were made on October 23.

